**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel E. Zaehringer, a Special Agent (SA) with Homeland Security

Investigations (HSI), being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I have been employed as a Special Agent of the U.S. Department of

Homeland Security, Homeland Security Investigations (HSI) since 2010, and am

currently assigned to the HSI Bangor, Maine office.  Since 2015, I have investigated

crimes involving the use of computers and the Internet and have investigated crimes

involving the sexual exploitation of children.  I have participated in the execution of

numerous search warrants, both residential and online accounts, and the seizure of

computers, cell phones, electronic media, and other items evidencing violations of federal

laws pertaining to the sexual exploitation of children. I have also participated in

numerous arrests and interviews of subjects involved with child exploitation and/or child

pornography and have review numerous examples of child pornography (as defined in 18

U.S.C. § 2256) in all forms of media including computer media.  As an HSI agent, I am

authorized to conduct these investigations and to request and execute search warrants for

evidence of violations of Title 18 of the United States Code.

2.      This affidavit is submitted in support of an application for a search warrant

for the locations specifically described in Attachment A of this Affidavit including the

entire property located at 68 Sunset Road, Deer Isle, Maine 04627, the person of

1

Nicholas Pettis (DOB:02/06/1983), an orange Ford Edge bearing Maine license plate 4816 UJ registered to Nicholas Pettis, and any devices seized, for contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252 and 2252A which are more specifically described in Attachment B of this Affidavit.

      3.     The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and computer records related to this investigation, and information gained through my training and experience. Based on this training and experience, there is probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252(a)(1) and (b)(1) (transportation of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. § 2252(a)(2) and (b)(1) (receipt or distribution of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. § 2252A(a)(1) and (b)(1) (transportation of child pornography); 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography), are presently located at the SUBJECT PREMISES.

## STATUTORY AUTHORITY

4.      As noted above, this investigation concerns alleged violations of the following:

a.      18 U.S.C. § 2252(a)(1) and (b)(1) prohibit any person from knowingly transporting or shipping, or attempting or conspiring to transport or ship, any visual depiction using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer or mail, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

b.      18 U.S.C. § 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign

3

commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.      18 U.S.C. § 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

d.      18 U.S.C. § 2252A(a)(1) and (b)(1) prohibit a person from knowingly mailing, or transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography, as defined in 18 U.S.C. § 2256(8), or attempting or conspiring to do so.

e.      Title 18, United States Code, Sections 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or

4

conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

      f.     18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## BACKGROUND ON KIK AND KIK REPORTS

5.     Kik Messenger (hereinafter "Kik") is a mobile application designed for chatting or messaging owned and operated by Kik Interactive, Inc. According to the previously publicly available document at the time of the uploads of child pornography, "Kik's Guide for Law Enforcement,"[1] to use this application, a user downloads the

---

[1] Available at: https://lawenforcement.kik.com/hc/en-us/categories/200320809-Guide-for-Law-Enforcement.

application to a mobile phone, computer, or other digital device via a service such as the iOS App Store, Google Play Store, Apple iTunes, or another similar provider. Once the application is downloaded and installed, the user is prompted to create an account and username. The user also creates a display name, which is a name that other users see when transmitting messages back and forth. Once the user has created an account, the user is able to locate other users via a search feature.  While messaging, users can then send each other text messages, images, and videos.

6.      According to "Kik's Guide for Law Enforcement," previous edition, Kik users are also able to create chat groups with a limited number of individuals to communicate in a group setting and exchange text messages, images and videos. These groups are administered by the group creator who has the authority to remove and ban other users from the created group. Once the group is created, Kik users have the option of sharing a link to the group that includes all of their contacts or any other user. These groups are frequently created with a group name containing a hashtag (#) that is easily identifiable or searchable by keyword.

7.      According to information provided to HSI by a Kik Law Enforcement Response Team Lead, Kik's Terms of Service prohibit Kik users from uploading, posting, sending, commenting on, or storing content that contains child pornography and/or child abuse images. The Terms of Service also provide that Kik may review, screen and delete user content at any time if Kik believes use of their services are in violation of the law.

6

According to Kik, Kik has a strong business interest in enforcing their Terms of Service and ensuring that their services are free of illegal content, and in particular, child sexual abuse material. Accordingly, Kik reports that it independently and voluntarily takes steps to monitor and safeguard their platform and that ridding Kik products and services of child abuse images is critically important to protecting their users, product, brand, and business interests.

8.      At the time of the child pornography uploads, Kik was located in Ontario, Canada and was governed by Canadian law. According to information contained in the "Kik Interactive, Inc. Child Sexual Abuse and Illegal Material Report and Glossary" (hereinafter Kik Glossary), which Kik provided when reporting information to law enforcement authorities in September 2019, Kik was mandated to report to the Royal Canadian Mounted Police (RCMP) any images and/or videos that would constitute suspected child pornography under Canadian law which are discovered on the Kik platform.

9.      According to the Kik Glossary, Kik is typically alerted to suspected child pornography on Kik based on digital hash value matches to previously identified child pornography or through reports from other Kik users or third party moderators.

10.     The RCMP has advised Homeland Security Investigations (HSI) agents that upon receiving a report from Kik related to suspected child pornography, the RCMP reviews the reported IP addresses of the Kik users contained in the Kik Reports to

7

determine their location. The RCMP then provides Kik Reports of Kik users in the United States to HSI in Ottawa, Canada, who in turn provides the Kik Reports to the HSI Cyber Crimes Center (C3) Child Exploitation Investigations Unit (CEIU) located in Fairfax, Virginia for analysis and dissemination.

11.     Kik was acquired by MediaLab.AI in October 2019 and is now based in Santa Monica, CA.  Kik is currently subject to US laws pertaining to the interception or discovery of child pornography on its platform and published a new law enforcement guide in February 2020. [2]

## PROBABLE CAUSE

12.     On about February 4, 2020, HSI Special Agent Greg Kelly received a Kik report from HSI C3 regarding the Kik account identified as "Freakfuzzy".  I have since reviewed the Kik Report dated September 24, 2019 and learned that on September 23, 2019, "Freakfuzzy" used Kik to distribute two images of child pornography.  The Kik Report contained data provided by the "Freakfuzzy" account user who provided the name associated with the account as "Freak Pet" and an email address of "nfuzzy62621@yahoo.com".  This email address was not confirmed by Kik.  The Kik Report showed the account was registered on December 22, 2018 and provided the registration client information as an Android Model XT-1575 phone.

---

[2] https://lawenforcement.kik.com/hc/en-us

13.     I have learned that Kik was alerted to the child pornography through use of

Microsoft's PhotoDNA technology. According to the Kik Glossary, Kik uses PhotoDNA

to automatically scan user-uploaded files in order to flag images that may depict

suspected child pornography and prevent such images from continuing to circulate

through their application.  When PhotoDNA detects a suspected child pornography file, it

creates a Report and sends it to the Kik Law Enforcement team. According to

information provided by a Kik Law Enforcement Response Team Lead, all suspected

child pornography images and videos reported via a PhotoDNA Report, as well as any

related user communications, are visually reviewed by a member of the Kik Law

Enforcement Response team before a report is forwarded to law enforcement authorities.

Kik trains employees comprising its Law Enforcement Response team on the legal

obligation to report apparent child pornography. The Team, at the time of the child

pornography uploaded to "FREAKFUZZY" account, was trained on the Canadian

statutory definition of child pornography and how to recognize it on Kik products and

services. Kik voluntarily makes reports to law enforcement in accordance with that

training. After Kik discovered the suspected child pornography, Kik removed the content

from its communications system and closed the user's account.

14.     Along with Kik's Report, Kik provided copies of the suspected child

pornography images that they located to the RCMP.  On March 18, 2020, I reviewed the

very same images that Kik had provided with the Kik Report sent to the RCMP and

forwarded to HSI. Those images had previously been located, isolated, searched and viewed by Kik personnel before they were reported to the RCMP. I reviewed only the previously located, isolated, searched and viewed by Kik personnel and observed that the images are child pornography as defined by Federal Law. Specifically, the images distributed by "Freakfuzzy" included the following:

    a. **Image-freakfuzzy_kb0-UPLOADIP-67.241.133.132-UPLOADTIME – 2019-09-23-1569265387059.UTC.png:** This file is a color photograph depicting a naked toddler, approximately 1 to 2 years of age, lying on her back with her legs spread apart to expose her vulva. The erect penis of an adult male can be seen next to the child's vulva and there is what appears to be ejaculate on the child's vulva, stomach, and chest. This image was uploaded on September 23, 2019 at 19:03 UTC (attached under seal as Exhibit 1).

    b. **Image-freakfuzzy_kb0-UPLOADIP-67.241.133.132-UPLOADTIME – 2019-09-23-1569265389876.UTC.png:** This file is a color photograph depicting a naked prepubescent girl, approximately 4 to 7 years of age, lying on her back with her legs pulled up to expose her vulva and anus to the camera. There is what appears to be ejaculate on the child's vulva and anus. This image was uploaded on September 23, 2019 at 19:03 UTC (image attached under seal as Exhibit 2).

15.     The information provided by Kik also included IP addresses associated with access to the "Freakfuzzy" account.  Specifically, IP address 67.241.133.132 was used by "Freakfuzzy" on September 23, 2019 at 19:03 UTC to distribute the child pornography images.  I reviewed the IP history which covered the period of August 23, 2019 to September 23, 2019 and noted the only IP address used to access the account during that period was 67.241.133.132.

16.     A query of the American Registry for Internet Numbers (arin.net) online database revealed that IP address 67.241.133.132 was registered to Charter Communications.

17.     On February 5, 2020, Special Agent Greg Kelly issued an administrative summons to Charter Communications requesting subscriber information for IP address 67.241.133.132 for the date and time it was used to upload the child pornography.  A review of the results obtained the same day identified the subscriber as Nicholas Pettis and the subscriber address as 68 Sunset Road, Deer Isle, Maine 04627, which is the address of the SUBJECT PREMISES.

18.     A search of the Clear information database (a public records database that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) was conducted for Pettis.  These public records indicated that Pettis was associated with the SUBJECT PREMISES as recently as March 30, 2020.  Clear also showed the email address "nfuzzy6262@yahoo.com" associated with Pettis which SA Kelly noted to

be very similar to the "nfuzzy62621@yahoo.com" associated with the "Freakfuzzy" Kik account.

19.     A check with the State of Maine Division of Motor Vehicles on February 5, 2020, revealed Pettis lists his home address on his driver's license as the SUBJECT PREMISES.  The Division of Motor Vehicles records also showed an orange 2007 Ford Edge bearing Maine license plate 4816 UJ currently registered to Pettis with the SUBJECT PREMISES listed as the registration address.  According to the records, this is the only vehicle registered to Pettis.

20.     A check of open source information from the Internet for "Freakfuzzy" and "nfuzzy62621@yahoo.com" returned negative results.  I searched the Internet for "nfuzzy6262" which returned results related to Pettis, to include a Myspace profile page which contained several pictures of an adult male.  I compared these pictures to Pettis' driver's license photo and believed them to depict the same person.

21.     On April 14, 2020, I issued a summons to Oath Holdings Inc., the owner of Yahoo, for subscriber information for Yahoo email accounts "nfuzzy6262@yahoo.com" and "nfuzzy62621@yahoo.com".

22.     On April 16, 2020, Oath Holdings Inc., issued a reply to the summons.  I reviewed the account information on the email account "nfuzzy6261@yahoo.com" and learned that the full name listed as the owner of the account is Nicholas Pettis with a cell phone number 207-460-2175 and that the account is still active.  The response further

stated that phone number was a "Verified" number, meaning that the phone number was either text or called to verify the validity of the creation of the email account. The response also stated the email account was created on November 13, 2016 at an unknown location.

23.     I also reviewed the subscriber information on the email account "nfuzzy6262@yahoo.com" and learned it was created on August 30, 2001 from an IP address in Fairchild, WI. It was also "Verified" with an associated phone number 207-460-2175. The name associated with the account is Nick Pet and shows an active status. It should be noted that during this time, according to a public record search, Nicholas Pettis was residing in Augusta, WI which is within 10 miles of Fairchild, WI.

24.     At this time, I also submitted a summons on US Cellular, the carrier on cellular phone number 207-460-2175, for September 2019, requesting subscriber and cellular phone information on phone number 207-460-2175.

25.     On May 21, 2020, I received a response on the summons. US Cellular response stated the account holder for cellular phone number 207-460-2175, is Nicholas Pettis and has had this phone number from at least September 2019, through May 21, 2020. The response further stated the phone for which service was being used is a Moto Z Force, which was the phone type used to upload the child pornography on Kik.

26.     On February 28, 2020, HSI Bangor Special Agent Loren Thresher conducted surveillance of the SUBJECT PREMISES and observed an orange vehicle

13

parked in the yard which fit the description of a Ford Edge.  While in the area of the

SUBJECT PREMISES, SA Thresher also conducted a wireless survey and noted the only

network broadcasting was identified as TG862GA2 and that it was a secure network.

      27.     On June 12, 2020, HSI Bangor Special Agent Daniel Zaehringer conducted

surveillance of the SUBJECT PREMISES and observed an orange Ford Edge bearing

Maine license plate 4816 UJ, registered to Nichola Pettis, parked in the driveway next to

the SUBJECT PREMISES.

      28.     Based on the above, I have probable cause to believe, and I do believe, that

the IP address that is assigned to the SUBJECT PREMISES was used to share child

pornography via the Kik application.  I further believe that Pettis, the subscriber of the IP

address at the SUBJECT PREMISES, is the user of the Kik user account "freakfuzzy"

and the owner of the email nfuzzy62621@yahoo.com and used a mobile cellular device

to upload child pornography.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

      29.     Based upon my training and experience and information relayed to me by

agents and others involved in the forensic examination of computers and mobile devices,

I know that data can be stored on a variety of systems and storage devices, including

external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD

cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy

disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite

storage servers maintained by corporations, including but not limited to "cloud" storage.

I also know that during the search of the premises it is not always possible to search

computer equipment and storage devices for data for a number of reasons, including the

following:

    a.    Searching computer systems is a highly technical process which

requires specific expertise and specialized equipment. There are so many types of

computer hardware and software in use today that it is impossible to bring to the

search site all of the technical manuals and specialized equipment necessary to

conduct a thorough search. In addition, it may also be necessary to consult with

computer personnel who have specific expertise in the type of computer, software

application, or operating system that is being searched;

    b.    Searching computer systems requires the use of precise, scientific

procedures which are designed to maintain the integrity of the evidence and to

recover "hidden," erased, compressed, encrypted, or password-protected data.

Computer hardware and storage devices may contain "booby traps" that destroy or

alter data if certain procedures are not scrupulously followed. Since computer

data is particularly vulnerable to inadvertent or intentional modification or

destruction, a controlled environment, such as a law enforcement laboratory, is

essential to conducting a complete and accurate analysis of the equipment and

storage devices from which the data will be extracted;

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

30.    Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of

16

all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  There are several reasons that compel this conclusion:

      a.     The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

      b.     In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU).

31.    Based on my training and experience, I know that many devices, which may contain contraband and fruits and evidence of crime, are by their very nature portable, this includes as example, but is not limited to, compact storage devices and

17

portable computing devices such as smart phones, laptop computers, and tablets. In my
training and experience, I know it is not uncommon for individuals to keep these devices
on their person and/or in multiple locations within their premises, including in motor
vehicles and garages. Further, any device capable of connecting to the Internet could
contain evidence showing ownership or control of relevant online accounts.

32.      Additionally, based upon my training and experience and information
related to me by agents and others involved in the forensic examination of computers, I
know that routers, modems, and network equipment used to connect computers to the
Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is
equally true of so-called "wireless routers," which create localized networks that allow
individuals to connect to the Internet wirelessly. Though wireless networks may be
"secured" (in that they require an individual to enter an alphanumeric key or password
before gaining access to the network) or "unsecured" (in that an individual may access
the wireless network without a key or password), wireless routers for both secured and
unsecured wireless networks may yield significant evidence of, or serve as
instrumentalities of, a crime—including, for example, serving as the instrument through
which the perpetrator of the Internet-based crime connected to the Internet and,
potentially, containing logging information regarding the time and date of a perpetrator's
network activity as well as identifying information for the specific device(s) the
perpetrator used to access the network. Moreover, I know that individuals who have set

18

up either a secured or unsecured wireless network in their residence are often among the
primary users of that wireless network.

## ELECTRONIC DEVICES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33.　As described above and in Attachment A, this application seeks permission
to search for DEVICES and seize data and images that the DEVICES might contain,
which pertain to violations of 18 U.S.C. §§ 2251 and 2252A.  Some electronic data on the
DEVICES may take the form of files, photographs, documents, and other data that is
user-generated.  Other data might become meaningful only upon forensic analysis.  There
is probable cause to believe that this forensic electronic evidence might be on the
DEVICES because:

　　　　a.　Data on the storage medium can provide evidence of a file that was
once on the storage medium but has since been deleted or edited, or of a deleted
portion of a file (such as a paragraph that has been deleted from a word processing
file).

　　　　b.　A person with appropriate familiarity with how an electronic device
works may, after examining this forensic evidence in its proper context, be able to
draw conclusions about how electronic devices were used, the purpose of their
use, who used them, and when.

　　　　c.　The process of identifying the exact electronically stored

19

information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or cell phone is evidence may depend on other information stored on the computer or cell phone and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       d.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

34.     Based on my knowledge, training, and experience, I know that:

       a.     Files or remnants of files can be recovered months or even years after they have been downloaded onto an electronic device, deleted, or viewed via the Internet. Electronic files downloaded to an electronic device can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is because when a person "deletes" a file from an electronic device, the data contained in the file does not necessarily disappear; rather, that data is no longer indexed but remains on the storage medium until it is overwritten by new data.

       b.     Wholly apart from user-generated files, electronic devices often

contain electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and other files.

c.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." These files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

d.     As further described in Attachment B, this application seeks permission to locate not only data that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how the DEVICES were used, the purpose of its use, who used it, where it was used, and when. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

e.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

21

f.      The government intends to make and retain a full image copy of the

seized media, so that a copy of the evidence, rather than the original evidence, can

be examined.  The government will seize and retain both the original evidence and

any copies of this evidence.  This procedure will ensure that the original evidence

remains intact.

### REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT

35.      It is respectfully requested that this Court issue an order sealing, until

further order of this Court, all papers submitted in support of this Application, including

the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with

the exception of one copy of the warrant and the inventory notice that will be left at the

SUBJECT PREMISES).  Sealing is necessary because the items and information to be

seized are relevant to an ongoing investigation and not all of the targets of this

investigation will be searched at this time.  Based upon my training and experience, I

have learned that online criminals actively search for criminal affidavits and search

warrants via the Internet and disseminate them to other online criminals as they deem

appropriate, *i.e.*, post them publicly online through forums.  Premature disclosure of the

contents of this Affidavit and related documents may have a significant and negative

impact on this continuing investigation and may jeopardize its effectiveness by alerting

potential targets to the existence and nature of the investigation, thereby giving them an

opportunity to flee, or to destroy or tamper with evidence.

## CONCLUSION

36.     Based on the foregoing, there is probable cause to believe that the federal
criminal statutes cited herein have been violated, and that the contraband, property,
evidence, fruits and instrumentalities of these offenses, more fully described in
Attachment B, are located at the locations described in Attachment A. I respectfully
request that this Court issue a search warrant for the locations described in Attachment A,
authorizing the seizure and search of the items described in Attachment B.

37.     I am aware that the recovery of data by a computer forensic analyst takes
significant time. For this reason, the "return" inventory will contain a list of only the
tangible items recovered from the premises. Unless otherwise ordered by the Court, the
return will not include evidence later examined by a forensic analyst.

Daniel E. Zaehringer
Special Agent
Homeland Security Investigations

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date:   Jun 23, 2020,

City and state:   Bangor, Maine

John C Nivison U.S. Magistrate Judge
Printed name and title

23